UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Tyco Healthcare Group LP d/b/a United States Surgical, a division of Tyco Healthcare Group LP,<br>*Plaintiff and Counterclaim-Defendant*,<br><br>v.<br><br>Ethicon Endo-Surgery, Inc.,<br>*Defendant and Counterclaim-Plaintiff.* | Civil No. 3:04cv1702 (JBA) |

**MEMORANDUM OF OPINION DISMISSING CASE**
**FOR LACK OF SUBJECT MATTER JURISDICTION**

In the trial of this patent infringement case, following the close of evidence in the Plaintiff's case-in-chief, Defendant Ethicon Endo-Surgery, Inc. ("Ethicon") has moved for a judgment as a matter of law on several grounds, including that the Court lacks subject matter jurisdiction because Plaintiff Tyco Healthcare Group LP ("Tyco") has not proved that it is the owner of the three patents-in-suit, U.S. Patents 6,063,050 (the "'050 patent"), 6,468,286 (the "'286 patent"), and 6,682,544 (the "'544 patent"). If Tyco does not possess title to the patents, it does not have standing, in which case the Court would lack subject matter jurisdiction. The parties have submitted multiple briefs discussing this point, including in response to a draft ruling circulated to counsel by the Court given the unexpected nature of the issue. For the reasons set forth below, Ethicon's motion is granted.

**I.      Legal Principles and Background**

The Federal Circuit has explained that "to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent at the inception of the lawsuit." *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003).

1

Standing is a constitutional prerequisite to the Court's subject matter jurisdiction, and the party asserting standing bears the burden of proof. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Only a "patentee"—a term which includes "the patentee to whom the patent was issued [and] also the successors in title," 35 U.S.C. § 100(d)—is a proper plaintiff in a patent infringement case. *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001); 35 U.S.C. § 281. A putative patentee "must produce [] written instrument[s] documenting the transfer of proprietary rights in the patents" in order to have standing. *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000). In this case, Tyco asserts that it has proven its title to the patents through the introduction of inventor assignments and an asset transfer agreement between its predecessor entities, United States Surgical Corporation ("USSC") and The Kendall Company LP ("Kendall").

### A. The Inventor Assignments

Each of the patents-in-suit is derived in part from two applications filed on August 14, 1997, bearing application serial numbers 08/911,205 (the "'205 application") and 08/911,207 (the "'207 application"). In early 1998, the six inventors credited on the patents-in-suit assigned their interests in these applications, via three instruments, to USSC (in part by way of another entity, Misonix Incorporated). According to the first two assignments (Pl.'s Exs. 387, 389), the inventors assigned

> the entire right, title and interest, including the right to sue for present, past and future infringement, in the United States, its territorial possessions, and in all foreign countries, including all treaty and convention rights in and to the invention and any and all improvements entitled: ULTRASONIC DISSECTION AND COAGULATION SYSTEM which is described in . . . U.S. application serial no. 08/911,207 filed on August 14, 1997.

The operative section of the third assignment (Pl.'s Ex. 391), included the same language

except that it referred to "the invention and any and all improvements entitled: ULTRASONIC CURVED BLADE which is described in . . . U.S. application serial no. 08/911,205 filed on August 14, 1997."

Subsequently, USSC executed two agreements effective April 1, 1999 which bear directly on who owns the patents in this case: (1) a "Contribution Agreement" between USSC and Kendall (Pl.'s Ex. 414), and (2) a "Settlement Agreement" between USSC and Ethicon (Pl.'s Ex. 93).

### B. The Contribution Agreement

In Section 1.1(a) of the Contribution Agreement, USSC agreed that it "hereby assigns, transfers, and delivers to [Kendall] . . . all of the assets, properties, and business," excepting certain "Excluded Assets," existing as of April 1, 1999. (Pl.'s Ex. 414 at 1.) The transferred assets are defined in Section 1.1(a)(iii) to include "[t]hose patents, copyrights, trademarks, technology, trade names, know-how, processes, trade secrets, inventions, proprietary data, formulae, research and development data, computer software programs and other intangible property . . . and any applications for the same, used primarily in [USSC's business]." (*Id.* at 1–2.) The Contribution Agreement then expressly excludes from this assignment certain "Excluded Assets," which are described in Section 1.2(a)(ix) as encompassing "[a]ny and all patents and patent applications relating to any pending litigation involving USSC." Later, Section 4.21 of the agreement enumerates certain representations and warranties by USSC, including specifically that:

> Except as set forth on Schedule 4.21 hereto, there are no actions pending or threatened by or against, or involving USSC . . . which question or challenge the validity of this Agreement, or any action taken or to be taken by USSC pursuant to this Agreement in connection with the transactions contemplated hereby or thereby, and to the knowledge of USSC, there is no

valid basis for any such Action.

However, the copy of the agreement submitted by Tyco at trial included no "Schedule 4.21."

### C. The Settlement Agreement

Contemporaneously, USSC entered into a Settlement Agreement with Ethicon which purported to resolve "five pending patent litigations" and several interference proceedings, also effective April 1, 1999. (Pl.'s Ex. 93 at 1.) According to the agreement:

> The parties wish to fully settle these litigations and fully resolve these interferences expeditiously and grant each other immunity from suit upon the terms and conditions set forth below. . . . The parties also recognize that unasserted claims of patent infringement may exist against each other and wish fully to resolve these existing, unasserted claims.

(*Id.*) In Article 2 of the agreement, the parties enumerated the various pending litigations and interference proceedings and described their respective then-existing products relevant to the immunity-granting provisions of the agreement. (*Id.* at 2–3.) In Articles 4 and 5, USSC and Ethicon agreed to dismiss with prejudice the several pending litigations and to grant each other reciprocal immunity from patent infringement. (*Id.* at 3–6.) Specifically relevant to this case, Section 5.2 provides in part:

> Subject to the terms and conditions of this Agreement, the USSC Parties hereby grant to Ethicon full and permanent immunity from suit under all domestic patents and patent applications as to which the USSC Parties currently hold or hereafter acquire the right to enforce and international equivalents thereof, such immunity extending only to continued or resumed manufacture, use, marketing and sale of Immune Products.

(*Id.* at 5.) The parties further agreed on terms relating to assignment as explained in Section 9.4:

> Each party may assign this Agreement or any other rights and obligations contemplated herein to an Affiliate of such party or to a company acquiring

> substantially all of the assets of such party to which this Agreement relates, without the consent of the other party, upon giving written notice thereof to the other party.

(*Id.* at 10–11.)

II.   **Discussion**

According to Tyco, these documents together constitute sufficient proof of ownership in the patents: the inventor assignments conveyed title in the '205 and '207 applications to USSC; these applications, by way of continuation applications claiming priority, eventually gave rise to the three patents-in-suit; USSC conveyed its patent rights to Kendall in the Contribution Agreement; and Kendall subsequently changed its name to Tyco (Pl.'s Ex. 415). Under this view, the USSC-Ethicon Settlement Agreement is not relevant to the issue of Tyco's ownership of the patents in this case. Ethicon, in turn, advances two arguments: (1) that the Contribution Agreement by its terms did not transfer the later-filed applications from which the '286 and '544 patents issued; and (2) that even if the applications were initially included within the Contribution Agreement, they were also expressly within the definition of "Excluded Assets" as "patent applications relating to any pending litigation involving USSC."

A.   **Definition of "Assets" in the Contribution Agreement**

Ethicon's first argument is based on the fact that the applications which led directly to the '286 and '544 patents were not yet pending on the April 1, 1999 effective date of the Contribution Agreement. (This argument does not apply to the '050 patent, which the parties agree was issued from a patent pending as of April 1, 1999.) By this reasoning, such non-existent applications could not be within the definition of "Assets" in Section 1.1(a) of the agreement. Ethicon further notes that, by comparison, the language of the inventor

5

assignments specifically contemplated continuation applications by referring to "the invention and any and all improvements" and "any continuation, division, renewal, extension or substitute thereof." Tyco responds to this by contending that

> while a continuation application is given a separate serial number from its parent application, it is not and cannot be a separate application in terms of the scope of disclosure, effective filing date[,] or the outer bounds of the invention claimed, and it is not a separate application in terms of Section 1.1(a)(iii) of the Contribution Agreement.

(Pl.'s Mem. [Doc. # 263] at 5.) On this point, Tyco's position is not unpersuasive; for the purpose of this ruling, the Court will assume that Tyco has shown that the rights to the patents-in-suit were as an initial matter within the definition of "Assets" to be conveyed in the Contribution Agreement.

### B. Meaning of "Relating to Any Pending Litigation"

Ethicon's second argument is more compelling. Adopting Tyco's contention that the applications which became the '286 and '544 patents—as well as the then-pending '050 patent—are within the scope of Section 1.1(a)(iii), the issue is whether they were excluded from the conveyance pursuant to Section 1.2(a)(ix). As mentioned above, the copy of the Contribution Agreement in evidence contains no "Schedule 4.21" elaborating on what the phrase "relating to any pending litigation" means. Steven Amelio, a vice-president for Plaintiff and the witness Tyco used to establish ownership, testified that he did not know to what the "pending litigation" term referred, either:

> Q. As of April 1st, 1999, Ethicon Endo-Surgery and United States Surgical Corporation were involved in several different patent infringement lawsuits; isn't that right?
>
> A. I know there was litigation, [but] I don't know specifically how many.

> Q. But you agree Ethicon Endo-Surgery and United States Surgical Corporation were involved in at least a couple patent infringement litigations, correct?
>
> A. Again, I know there was litigation. I cannot speak to how many.
>
> Q. Do you agree, Mr. Amelio, that United States Surgical Corporation and Ethicon Endo-Surgery were involved in at least one patent litigation that was pending as of April 1, 1999?
>
> A. Yes.
>
> Q. And the agreement that you were just handed, Plaintiff's Exhibit 93, settled that lawsuit, didn't it?
>
> A. It would settle what litigation was involved relative to the settlement. I can't speak specifically [to] which.

(Trial Tr. vol. VI, Dec. 10, 2007, 984:20–985:17.)

Thus, the Settlement Agreement is relevant to determining what was excluded from assignment in the Contribution Agreement. In this regard, the breadth of the Settlement Agreement is apparent: in Article 1, USSC and Ethicon referred to not only their pending legal actions, but also any unasserted claims they may have had against each other; and in Article 5, the parties granted each other's then-existing products full immunity under all "patents and patent applications [which they] currently hold or hereafter acquire." Looking specifically to Section 5.2, if (as Tyco contends and the Court here assumes) the '205 and '207 applications are the operative applications with respect to the patents-in-suit, they qualify as "patent applications as to which the USSC Parties currently hold," and are included within the grant of immunity. This is consistent with the evidence in the case showing that Ethicon's straight blade products—which existed on April 1, 1999—are immune from Tyco's current claims of infringement. Mr. Amelio confirmed this during his

7

cross-examination testimony:

> Q. Mr. Amelio, under the agreement that is plaintiff's Exhibit 93, United States Surgical granted Ethicon immunity from future suits under any of United States Surgical's patents or patent applications for Ethicon's then current products; isn't that right?
>
> A. Yes, it is. . . .
>
> Q. Mr. Amelio, it's true, is it not, that both parties in this lawsuit agree that the LCS B5 and LCS K5 products were granted immunity from a charge of infringement by United States Surgical Corporation under the patents at issue in this litigation pursuant to the settlement agreement of April 1, 1999?
>
> A. I know of the products by straight blade or curved blade. I don't know the specific model number of the products.
>
> Q. It's true, is it not, that the straight-bladed products that are sold by Ethicon under the Harmonic Scalpel brand name were given immunity from a charge of infringement to the patents in this lawsuit by the terms of the agreement that is Plaintiff's Exhibit 93; isn't that right?
>
> A. Yes.

(Trial Tr. vol. VI, Dec. 10, 2007, 988:6–12, 989:4–20; *see also id.* 1004:21–1005:5.)

Therefore, if the applications leading to the patents-in-suit were included within the immunity grant contained in Section 5.2 of the Settlement Agreement, they necessarily "related to [the] pending litigation" between USSC and Ethicon that the agreement set out to resolve. And because the relevant applications were related to this broadly-defined class of litigation, they were definitionally among the "Excluded Assets" not conveyed from USSC to Kendall in the Contribution Agreement. It follows, then, that the rights to the patents-in-suit could not have passed to Tyco based on the evidence in the record.

Tyco, citing to principles of contract law, objects to this use of the Settlement

8

Agreement to understand the Contribution Agreement as improper reliance on extrinsic evidence. However, the Court disagrees with this characterization for two reasons. First, the Contribution Agreement, taken alone, is insufficient to establish that Tyco has rights to the patents-in-suit by a preponderance of the evidence. Without further elaboration on the meaning of certain provisions in the agreement—most importantly, the language "relating to any pending litigation"—the Court cannot conclude that Tyco has proved its standing as the patentee. Additionally, Tyco has contended elsewhere that the two agreements, executed on the same day, should be read in conjunction with each other in order to understand their respective meaning. For example, in a colloquy with Plaintiff's counsel, Mr. Amelio testified:

> Q. . . . Were all of the obligations, to your understanding, in these two agreements, the settlement agreement and the contribution agreement, both dated April 1, 1999, intended to be carried out on the same day so as to effectuate both?
>
> A. I believe so, yes.

(Trial Tr. vol. VI, Dec. 10, 2007, 1010:17–22.) This is consistent with the Federal Circuit's approach:

> Whether a transfer [is effective] is determined by the substance of the transaction and a transfer will suffice . . . if it appears *from the agreement and surrounding circumstances* that the parties intended that the patentee surrender all his substantial rights to the invention.

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 874 (Fed. Cir. 1991) (citation omitted and emphasis added). Under these circumstances, the Court cannot see how each agreement is *not* relevant to understanding the provisions of the other. And in so construing the agreements—as explained above—the most convincing reading of this evidence is that Tyco has not met its burden of proving that it has rights to the patents-in-

suit.

Ethicon makes two additional points which only strengthen this conclusion. First, under Section 9.4 of the Settlement Agreement, USSC agreed to give written notice to Ethicon in the event USSC assigned its assets covered by the agreement to another entity; Ethicon received no such notice. Second, careful inspection of the Complaint reveals that Tyco has been inconsistent in characterizing its relationship to USSC. In paragraphs 10 and 11, Tyco alleged:

> 10.     United States Surgical Corporation is an assignee of each of the '050, '407, '286, and '544 patents.
>
> 11.     United States Surgical Corporation was acquired in October 1988 and is now a division of Tyco Healthcare Group LP. Tyco Healthcare Group LP, through its United States Surgical division, holds all the former United States Surgical Corporation's right, title, and interest to the '050, '407, '286, and '544 patents.

(Compl. [Doc. # 1] ¶¶ 10–11.) The Complaint additionally names "U.S. Surgical" as the party which gave notice of infringement to Ethicon, which suffered damages and irreparable injury, and which prayed for relief. (*Id.* ¶¶ 18–21.) But Mr. Amelio testified that the actual corporate structure is different:

> Q.     Mr. Amelio, is U.S. Surgical Corporation a subsidiary of Covidien?
>
> A.     I'm not sure. U.S. Surgical Corporation, there is a legal entity still called U.S. Surgical Corporation. It would be a subsidiary of Covidien.
>
> Q.     It would be a subsidiary of Covidien?
>
> A.     Yes.
>
> Q.     Is that entity the same entity that sells the AutoSonix products in the United States?

10

> A. I'm not certain of, today, how the current structure of U.S. Surgical Corporation is. It was not prior to the Covidien separation.
>
> Q. I'm sorry, I think I may have misunderstood your answer. There's an entity called United States Surgical Corporation that exists in the United States, correct?
>
> A. There is still a legal entity entitled United States Surgical Corporation.
>
> Q. Does that entity sell the AutoSonix products in the United States?
>
> A. I do not believe it does.
>
> Q. And does that entity sell the LigaSure 5 products in the United States?
>
> A. I do not believe that [it] does either.
>
> Q. And does that entity sell any international products of any type?
>
> A. I do not believe it does.

(Trial Tr. vol. V, Dec. 7, 2007, 904:15–25, 905:1–16.)

Consequently, Tyco has not sustained its burden of proving that it, and not USSC or any other entity, is the owner of the '050, '286, and '544 patents. This flaw is fatal to the case, for the Court has jurisdiction only if Tyco has standing as the patentee. The Court must therefore dismiss the case.

### C. Nature of Dismissal

The remaining issue is whether dismissal should be with or without prejudice. Ethicon contends that dismissal with prejudice is warranted in this case because Tyco failed to prove patent ownership during its case-in-chief and "obfuscated the issue of ownership" throughout the litigation. (Def.'s Jan. 2, 2008 Submission [Doc. # 269] at 3–4.) According to Tyco, however, dismissal without prejudice is appropriate under Federal Circuit precedent

because Tyco could cure the standing defect by obtaining a valid assignment of the rights to the patents-in-suit and then filing a new complaint. (Pl.'s Jan. 4, 2008 Resp. [Doc. # 270] at 15.)

Under the Federal Circuit's view, "[a] dismissal with prejudice bars a subsequent action between the same parties or their privies on the same claim, but a dismissal without prejudice, although it constitutes a final termination of the first action, does not bar a second suit." *H.R. Techs., Inc. v. Astechnologies, Inc.*, 275 F.3d 1378, 1384 (Fed. Cir. 2002). Facing a similar question in *Fieldturf, Inc. v. Southwest Recreational Industries, Inc.*, 357 F.3d 1266, 1269 (Fed. Cir. 2004) (citation and quotation marks omitted), the court explained that "[o]rdinarily, dismissal for lack of standing is without prejudice. On occasion, however, a dismissal with prejudice is appropriate, especially where it is plainly unlikely that the plaintiff will be able to cure the standing problem." In *H.R. Technologies*, the Federal Circuit panel affirmed the district court's conclusion that the plaintiff "could cure its standing defect by executing a valid assignment and re-filing its complaint, and that nothing in the first proceeding provided any compelling reason to deprive [the plaintiff] of the right to seek to enforce its patent." 275 F.3d at 1384. Those facts are analogous to the circumstances of the present case, and the Court agrees with Tyco that the same disposition should follow. Moreover, Tyco allays Ethicon's concern by clarifying that it makes no claim that "it can cure its standing problem [vis-à-vis these patents] by a *nunc pro tunc* assignment." (Pl.'s Jan. 4, 2008 Resp. at 3.) Accordingly, the appropriate disposition of this case is dismissal *without* prejudice.

III.    Conclusion

For the foregoing reasons, Ethicon's Motion for Judgment as a Matter of Law [Doc.

# 255] is granted, and Tyco's claims—as well as Ethicon's counterclaims—are dismissed without prejudice. The Clerk is directed to close the case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 9th day of January, 2007.